Robert Klor for the appellant James Migliaccio. I'd like to focus primarily on two issues, both of which surface in this court's two target data breach opinions from 2017 and 2018. The first is, does the rigorous analysis and close scrutiny required for determining adequacy of counsel under Rule 23a allow a district court to ignore the ethics opinions of experts sought out by class counsel concerning a potential conflict? Is the district court required to look at the opinions and aren't the class members as their clients entitled to informed consent concerning the potential conflict? The second issue, which relates to the 2018 target data breach opinion after the remand, asks when a factual error is so egregious as to give rise to an abuse of discretion. Before I get to those points, I'd briefly like to address the standing arguments raised by the parties, primarily by class counsel. Mr. Migliaccio can be redressed through the appeal. There has not been complete class recovery. A $21.5 million settlement for $70 million in estimated class damages is on its face, not complete class recovery. Even if you look at it on a per claimant basis, the 50% out-of-pocket damages still aren't complete recovery because they don't address and don't account for punitive damages that were alleged. The parties want to say you don't consider punitive damages in considering the adequacy of the settlement, which I think is generally true. But that's not what we're talking about here. We're talking about, has there been complete class recovery? And the answer is no, those claims have not been addressed. And the settlement broadly releases all claims, including punitive damages claims, so obviously they have some value. Finally, even as to standing, even if Mr. Migliaccio can't get any more through the appeal, he at least has standing to challenge the conflicts of interest involving class counsel and the class's right to review the expert opinions. On that point, we know there's at least a potential conflict because class counsel sought out multiple ethics experts on the conflict. A rigorous analysis and close scrutiny are required, according to the target opinion, to protect the due process rights of class members. And under AMCM, the district court was required to uncover conflicts. But all we have here is class counsel statements that he met with an expert, and after meeting with him, he was comfortable in going forward. Strict scrutiny or close scrutiny and rigorous analysis required the court to go behind that statement and to inquire into the nature of those opinions and then to have them presented to the class. The court didn't do that and just simply remarked at the fairness hearing that meeting with an ethics expert was an act of prudence. That may be true, but at the very least, the court needed to go behind them and the class needed to know about them. There's still been no explanation as to why the class members weren't given this information concerning the potential conflict. We asked for it and we were rebuffed at the court, at the district court. And then the declaration of co-counsel Martin Gersat, who said there was a conflict, was dismissed on the incorrect premise that it was unsigned when it in fact was signed. So it's our position that the case should be remanded for the district court to conduct a more probing inquiry as to the nature of the ethics opinions that are still undisclosed, or at least some inquiry. At present, no inquiry has been conducted. And that's just not consistent with the court's opinion in Target Data Breach or in the Supreme Court's Amkin opinion. Let me also address the factual misstatements about class size, which pervade the district court's opinion. The court got it wrong on this class size and it took, you know, it took those numbers from class counsel. The only evidence in the record is that the class was 3.5 million members. And that came from a declaration from the settlement administrator. The 500,000 figure was something that comes from class counsel's a single footnote and a fee reply and was not submitted in a declaration. So the 3 million difference in class members is a clearly erroneous factual determination. The question then is, what is the effect of that clear error? Was it just a side note or did the court rely on it? The district court's order identifies the supposed 541,000 class members on page 6 of its order before approving the settlement. And then the supposed 13% claims rate, which is also an error on page 7 and then again on page 15. And then only on page 18 does the district court actually approve the settlement. So it's necessarily interwoven with the opinion. And just conceptually, you can't, the most important factor is the merits of the plaintiff's case weighed against the terms of the settlement. How can you possibly weigh the merits of the plaintiff's case if you underestimate the class size by sixfold? So it's obviously an impactful error. Class counsel and Monsanto argued that we waived those arguments, but we mentioned the size of the class repeatedly to the court. And they also argue that during the fairness hearing, our local counsel, Pete Woods, said he agreed with the 13% claims rate. And that's just, that's a misreading of the transcript. What was asked of him by Judge Fleisig was whether he agreed that the 13% claims rate would be high, to which he responded, yes, it would, which is correct. It would be. How accurate does the estimate of the class size have to be to qualify as sufficient? I think that's case by case. But I think when it's six times, it's an underestimate. When it's underestimated by six times, there's clearly a problem and there needs to be reconsideration. There needs to be review. I can't quantify it. Do we have case law that gives us parameters for evaluating that question? No, I don't have any case law that says the degree of miscalculation, what degree of miscalculation would require reversal. I just don't, I can't conceptualize how you can say a six times fewer class members. And then the final point is the excess fees can and should go return to the class under Bank of America and ALI principles. It's the class's property and not the third party's. The court already determined that redistribution was feasible. It decided the class shouldn't get it because there was complete recovery and anything more would be a windfall. But again, there was not complete class recovery. The Bank of America case issued by this court looked at a settlement, looked at the settlement globally and not on a per claimant basis and then noted the plaintiffs would recover, quote, only a percentage of the damages sought. That's what we have here, percentages of the damages sought. I was wondering about the Bank of America case. The phrase liquidated damages is used in that case. What does that mean in that context? That's an excellent question. And I have actually been pounding my head trying to, you know, there are various... Well, me too. There are various descriptions of liquidated damages and unliquidated damages. And my understanding is liquidated damages arises in the context of a contractual action where the parties have anticipated the amount of damages. But then, you know, sometimes you hear that liquidated damages referred to as quantified. So I'm not certain, to be honest with you, what the meaning of that term... Would that mean to exclude punitive damages, do you think? Does it mean compensatory damages? I don't read it as excluding punitive damages. Yeah. Well, punitive damages could be liquidated. They could be. It's possible. It's possible. I never heard of that, but I mean, it's not a contradiction in terms. Correct. So I puzzled over that. I'm not sure what that means. You and me both. And I wish I had a more concrete answer for you, but that's... Yeah. Okay. Well, that's a good answer because I share the difficulty that you have. I think on that note, the Second Circuit's opinion in Masters, where the courts determined that claimants did not have complete recovery, where treble damages were still outstanding. It's not... Obviously, it's not on point because we're not talking about treble damages, but it's damages beyond actual damages. And the court even noted that distinction. And it didn't discuss punitive damages, but it noted it was going beyond actual damages. The parties want to talk about that... Let's see, is this... They want to talk about that Masters case just didn't make any reference to whether those damages are ascertainable or not. It was just a question of, is that something that were contemplated as actual damages under the settlement? That is, the treble damages were part of the class claims, even if they weren't contemplated as actual damages under the settlement. Class counsel in Monsanto say the district court wasn't free to rewrite the settlement to allow for redistribution, but the settlement actually contemplates that the court can deny approval and then, quote, the parties will seek in good faith to revise the agreement as needed to obtain court approval. That's at appendix 165. That's what should have happened. We did preserve our complaint about Cypre, at least as it pertained to the excess fees, and that's at appendix 401 through 402. And the SIR reply after they alleged our complaints about the settlement. Finally, even if we didn't preserve air, which we did, the court has by duty to make sure the proceeds go as much as possible to the intended beneficiary. Unless you have any further questions, I'll save my time. Thank you, counsel. And you must be Mr. Fitzgerald. I am. Good morning. May it please the court, I'm Jack Fitzgerald and I represent the Plaintiff Appellees, Rawa et al. Mr. Rosenthal represents Monsanto and he's going to address the Cypre issue, but I'm going to address the class size. So starting with the ethics, this case was a very common situation. You get a state class certified. You go into negotiations with the defendant. The defendant, of course, wants nationwide peace. And so you negotiate a nationwide settlement. And this was even more pressing for Monsanto in this case because there were nine copycat lawsuits filed in various states across the country by the time that we had gotten the case certified and were negotiating settlement for the first time. So once we had a state case certified, we settled a nationwide class. That's really what the projector is saying the conflict is because, of course, we did the transfer merely to facilitate preliminary approval of the settlement agreement we had already reached. Now, this whole thing about consulting an ethics expert, this only came up because in the middle of after we had announced publicly that we had a $21.5 million settlement, I got a call from a colleague of mine, and we described this at pages 14 to 15 of our brief, but I got a call from a colleague saying that there was another lawyer who was basically thinking of some way to try to intervene in the case and was asserting some sort of a conflict. So I thought it was prudent to consult an ethics expert to make sure that there wasn't a conflict and to protect ourselves against this sort of an argument. And so in my case, I contacted several experts. That was true because I emailed several, but in fact, I only ever spoke to one. And the objector asked for the disclosure of that expert's opinion. I would argue that the opinion has been disclosed. First of all, what the objector calls a potential conflict was clearly disclosed both to Judge Walter and to Judge Fleissig. To Judge Walter, before we asked for transfer, to Judge Fleissig, we told her we were seeking transfer. She knew the Martin case was certified, so the judges knew entirely what was going on. I also told Judge Walter in a declaration that I consulted with an ethics expert, and after that consultation, I felt confident that transfer was entirely appropriate and that there was no conflict. It doesn't expressly say what the opinion is, but anybody reading that sentence would know what the opinion is. Third, it was disclosed to the class, and as much as the notice mentioned at least that the case, and to the Rawa case for people in the other 49 states. So at the end of the day, though, the question is, is there a conflict? And clearly, the answer is no. During the final approval hearing, and most importantly, the district court abused its discretion upon no conflict. So during the fairness hearing, which was two hours, the court gave the objector the opportunity to say many times what the potential conflict would be or how he could be better off from a damages perspective if there were no nationwide settlement, and the objector clearly was not able to articulate that. And that really actually goes well into standing because the reason the objector could not articulate that is because he's getting something like 127% of his damages under our damages analysis and methodology in this case, according to our expert. So the damages are basically for the one product that was in the 40%, 38% range, another product, 45% range, the average was about 43%. Everybody's getting back 50%. So if this objector gets this settlement vacated and goes to trial and prevails at trial under the class's damages theory, he'll get less than he's getting under this settlement. So he's got no standing, and there's no conflict. Regarding the class size, as we explained in our brief, the 3.5 million was an initial estimate by the class administrator's media partner, based on media consumption data, in an effort to try to get broad notice. And we had a lot of money to play with. We put a lot of money to notice. The objector agreed that notice was robust in this case, as the court pointed out too. And so we did wide notice, and they were trying to do wide notice. Now, the objector says that the final number that we arrived at, the 511, isn't based on any evidence. It's just a footnote in the preliminary or final approval reply. That's not true. It actually comes from the declaration of the class administrator, Kim Ness, and that's at appendix 330, that paragraph of her declaration supporting final approval that mentions those numbers. But in any event, just as a matter of statistics and logic, if you've got 70,000 people making a claim for $22 million, you divide that $22 million by the $164 million that was at issue, it's a pretty good deduction that if it's 13% of the dollars that were at issue, then 70,000 people must be 13% of the people that purchased it. Now, is our number 541 exact? Of course it's not exact. The exact number is inherently unknowable. But consider this, even if the claimant's overstated by 20%, then maybe the real number would be 11% or 10%. In any event, it's very high. But none of the Van Horn factors speaks to claims as being one of the factors in determining whether a settlement is fair, reasonable, and adequate. And I just want to go back to Marshall, where you, Judge Smith, and Judge Kelly were on the panel and said, you know, a settlement agreement is presumptively valid. And an abuse of discretion, to show an abuse of discretion, the objector has to show that the district court did not consider all relevant factors, was significantly influenced by an irrelevant factor, or committed a clear error in weighing the factors. And if you look at this decision, this is a beautiful decision, 28-page decision by Judge Smith, with headers showing every factor. She identifies all the correct tests, Van Horn, the four factors. She has a section for each factor, discusses them very clearly. On the fees, she discusses the Johnson factors. She identifies the 12 Johnson factors and discusses many of them. So she was aware of the numbers. As the objector said, he cited the 3.5 million. She was aware of the 541,000. She made a finding based on the evidence in the record. And the objector cannot show an abuse of discretion, cannot show, other than speculating that one number is more accurate than another, cannot show an abuse of discretion. But at the end of the day, number one, claims rate is not an element of whether a settlement is fair, reasonable, or inadequate. And number two, the district court's decision really didn't rely on it. She cited it in the excellent results section, but only as the very last factor after talking about all the class relief and the injunctive relief. She cited it in the fees, but again, the last thing she cited after talking about the other things. And she cited it in the SIPRI section as well. But again, it was a number of factors that led her to conclude that a SIPRI distribution was acceptable. So finally, on the waiver issue, I believe the objector misstates the testimony given at the court on page 66 of the transcript of the final approval hearing, which is in Monsanto's addendum. She says, and are you quarreling that a 13% claims rate is not an extremely high claim rate in a case of this sort? And the answer is, I'm not quarreling with the 13%. Now in the brief and up here, the objector says that statement was about, I'm not quarreling that if 13% was accurate, it would be high, but I am quarreling with the accuracy. That's not what it said. And also there was another opportunity in the transcript that my co-counsel, Mr. Jackson, had mentioned. The objector doesn't quarrel, but doesn't dispute the 13%. And he had a chance to speak after that before we joined her and didn't dispute that either. So even though this response is non-responsive, I believe it's telling. And when you read it as the statement it is, I believe it's a waiver of the issue, but it certainly wasn't raised below. And so there's a waiver on that basis as well. If the court has any questions, I'm happy to answer. Otherwise, I think I'll turn it over to Monsanto's counsel. All right. Okay. Mr. Rosenthal. May it please the court. John Rosenthal from Monsanto Company. Your Honor, I'd like to turn to the side prey issue that the court raised. On the fairness of the settlement, I would like to point out to the court that the appellant here takes great liberties with the record here. If the court looks closely at the actual record, the decision, the transcript, and the documents, what they've tried to do is create factual issue here that don't reflect what the actual record in the case is here. Reality is there were preliminary numbers that submitted to the district court. Then there were subsequent numbers that were refined. It was based upon those subsequent numbers at the fairness hearing that the court focused on. Those numbers were the 541,000 and the 13%. Now, even then the district court did not predicate her findings and the approval of this settlement on that. It was on the Van Horn factors. And specifically, what the court looked to was the overall fairness of this settlement. And in this settlement, almost unlike any other settlement in the consumer products area in false advertising, the plaintiffs here are getting more than 100% of their damages. This case was about a little sticker on the neck of a bottle that said that you could get up to X gallons. So for example, it was a concentrate and it said you could get up to, for example, 24 gallons. It didn't say you would get 24 gallons. It said up to 24 gallons. So it implies that you could get less. Yes, your honor. The plaintiff's position in the case was that the plaintiff believed they were getting less than approximately one half of what was actually in the bottle. And in this case, the payment rates in the settlement were over that amount. The plaintiff's expert estimated that the percentage of quote-unquote underfill was about 43%. The settlement was predicated on payments more of 50% or greater. In this case, the settlement payments were between 100% and 127%, depending on the jurisdiction in which product was purchased. In this case, there's 100% recovery here. So I'm not really sure why plaintiffs are here arguing and why objectors here, especially when his client shouldn't even have standing since he recovered more than a full amount, more than the own expert in California said he was entitled. Turning to the Cypre issue here. First, the objector waived this argument. There's only one mention in the record, and that was in the context of they mentioned, the objector mentioned it in the context of the attorney's fee provision. So why isn't that at least good enough for the attorney's fees question? For the attorney's fees it is, but the objector is challenging the whole use of Cypre in the context of this settlement. But okay, but if you focus just on the attorney's fees question, the Cypre issue is still in the case, is it not? It is, Your Honor. Okay. So turning to the Cypre here, the objector is not challenging the Eighth Circuit's position, and the Eighth Circuit's position is, assuming the ALI factors are appropriate, Cypre is appropriate in the use of class settlements. Now, there are two factors to look at here, and let me quote from the Eighth Circuit in Bank America, because the third party of unclaimed settlement is permissible only when not feasible to make the further distribution to the class members, except where an additional distribution would provide a windfall to class members with liquidated damages. What does that mean? What it means, Your Honor, is- I mean the liquidated damages phrase. So liquidated damages, Your Honor, means compensatory damages. I'm sorry? It means compensatory damages. So liquidated damages really come out of the context of breach of contract situations, and if you look at Black's Law Dictionary, Black's Law Dictionary describes it as an amount contractually stipulated as a reasonable estimate of actual damages to be recovered by one party if the other party breaches. But there's no contract here, right? Correct. So in fact, was there one in Bank America? No, there wasn't, Your Honor. So the phrase is kind of out of place, isn't it? It is out of place. When you go on to look at the Blacks, it talks about the difference between punitive nature of damages versus compensatory nature of damages here. And we would submit, Your Honor, liquidated damages really describes punitive- really describes compensatory, not punitive. It really does what? Would describe compensatory. Well, that's kind of the way I thought about it, but conceptually, I'm not sure there's any- there can't be such a thing as liquidated punitive damages. I don't see why a contract couldn't provide for that. I've a contract could provide for a breakdown of punitive damages. So they could be liquidated. But you're saying that in this context, liquidated means compensatory? Correct, Your Honor. Why is that? Well, I think if you look to the Eighth Circuit's law here and its focus on the compensatory nature of damages here, and in looking at fairness of settlements, including the Petrovic case- I think that makes sense as an abstract matter. I just wonder why the court didn't just say compensatory damages rather than liquidated. I don't know. No reason to pursue this any further. I guess I think we're all, at least most of us so far, not quite clear about what it means. It's our job to figure that out. Yes, Your Honor. Or maybe. I see I'm out of time, so unless there are other questions also. Thank you, Mr. Rosenthal. Court thanks all counsel for the argument you've provided to the court this morning. In the briefing that's been submitted, we will take the case under advisement. Ah, counsel. Mr. Klor, I'm sorry. I'm staring at 315 up there and I'm not thinking. Please accept my sincere apologies. No problem. Three minutes will hopefully go by fast. My, I hope you don't feel slighted in any way. It was no intention this beginning. No, no, no. Not your case. Thank you, Judge. Monsanto's counsel talked about liberties with the record and that's, I feel like that's a pot calling the kettle black. They break it down as preliminary numbers as opposed to subsequent numbers. There's just no, that 541,000 figure is not in the administrator's declaration. There's a reference to the total claims and a reference to the value of total sales and they extrapolate numbers from that to arrive at a 13% claims rate, but that's backwards. You don't wait until the claims process is done, look at how many claims there are, and then say, well, there must be this many class members. That's not how it's done and it's not how it was done in this case. The settlement administrator said, this is our reasonable estimate of 3.5 million class members. That was never taken back and there's no declaration that says the 3.5 million number was inaccurate. So our recitation of the record is accurate. As far as class counsel's discussion of the conflict of interest, the transfer order from the California court is not the same thing and it's not the same standard as a final certification order where you're required to undergo rigorous analysis, closely scrutinize, and uncover conflicts. So that's not good enough. He obviously recognized a conflict because he sought out multiple ethics experts, and if there's no problem with the ethics report or the ethics expert report, why not submit it? Why not file it with the district court? And why not disclose it to the class? If there's no problem, I don't see why he wouldn't have done that. He's just standing up here saying, you should read into this. You can guess what it must say, but we don't know what it says. And we don't know why he emailed multiple ethics experts and if some said, you know what, there is a conflict. There is a potential problem. And again, he says, well, we couldn't name that. We couldn't identify, specify exactly what the conflict was. But that's his obligation. That's his burden to establish that he's an adequate representative of the class and that there are no conflicts. I think that's all I have. Thank you, judges. I give you your 20 seconds back. Thank you, Mr. Clore. Again, thank you, counsel, for helping the court with a difficult case. We'll take it under advisement and render decision in due course.